PUBLIC SAFETY EMPLOYEES ASSOCIATION, LOCAL 92, INTERNATIONAL UNION OF POLICE ASSOCIATIONS, AFL–CIO, Appellant,

v.

STATE of Alaska, Appellee.

No. 4213.

Supreme Court of Alaska.

May 26, 1995.

James A. Gasper, Jermain, Dunnagan & Owens, Anchorage, for appellant.

Virginia B. Ragle, Patrick Gullufsen, Asst. Attys. Gen., and Bruce Botelho, Atty. Gen., Juneau, for appellee.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

COMPTON, Justice.

### I. INTRODUCTION

This dispute arises out of arbitration proceedings between the State and the Public Safety Employees Association (PSEA). An arbitrator held that the State was obligated to pay certain employees geographic differential increases commencing September 1, 1990. The State maintained that it could not pay the differential increases by that date. It claimed that the Public Employment Relations Act (PERA), AS 23.40.070–23.40.260, required that the legislature appropriate the funds necessary to pay the increases. However, since the legislature was in recess and would not reconvene until sometime after

September 1, the State could not obtain an appropriation in time to comply.

When September 1 passed without payment, PSEA initiated another arbitration proceeding. The arbitrator concluded that the State could have implemented the increases without legislative approval. This could have been accomplished via a reduction in staffing and a reallocation of resources. Accordingly, the arbitrator ruled that penalty pay was due from September 1 until the differential increases were fully paid. The State disputes this penalty.

The State appealed the arbitrator's decision to the superior court. The superior court granted the State's motion for summary judgement, holding that until the legislature appropriated funds to pay the increases, there was no underpayment; hence, no penalty pay was due.

PSEA appeals. We affirm.

## II. *FACTS AND PROCEEDINGS*

This dispute grows out of three separate arbitration proceedings between the State and PSEA. It is the third proceeding that is at issue.

Pursuant to provisions of PERA, a mandatory interest arbitration proceeding was initiated to resolve certain bargaining issues on which the State and PSEA were unable to reach agreement during their attempt to establish a successor collective bargaining agreement. *See* AS 23.40.200. In the first proceeding, the arbitrator noted that Article XVII Section 3 of the collective bargaining agreement became effective May 16, 1990, per agreement of the parties. This provision required that

> [T]he Employer shall verify pay shortages within two (2) working days following receipt of a dated and written complaint accompanied, when necessary, by a corrected Payroll Report signed by the member's supervisor. In the event that a pay

shortage is determined to exist, the Employer shall issue payment for the shortage within five (5) working days of the date of verification. For pay shortages exceeding $400 above the normal base rate of pay, or shortages to the normal base rate of pay, and/or *geographic pay levels, not received within the five (5) days, there shall be a penalty of $40 per day.* Other pay shortages not received with the next warrant shall be subject to the $40 per day penalty rate. *Penalty pay for any single pay shortage incident shall not exceed $400 per calendar month.*

(Emphasis added.)

In the second arbitration proceeding, the arbitrator ordered the State to implement PSEA-requested geographic pay differential increases for sixty-four employees, effective September 1990.[1] However, the State chose not to implement the increases in September 1990. In an internal memorandum from the Commissioner of Administration to the Governor's Chief of Staff, the State contemplated two options in making what it deemed a "policy decision":[2]

> [a] policy decision as to whether the Department of Public Safety (DPS) should [1] be allowed to absorb the increased cost, or [2] whether the increase should be submitted to the next legislative body for appropriation as a "monetary term" under ... AS 23.40.215(a).

The second option originates from the language of AS 23.40.215(a), which provides:

> The monetary terms of any agreement entered into under [PERA] are subject to funding through legislative appropriation.

Further, "monetary terms of any agreement" are defined as

> the changes in the terms and conditions of employment resulting from an agreement that will require an appropriation for their implementation or will result in a change

---

1. In their briefs, the parties have not quantified the amount of penalty pay, nor does it appear in the record. It is estimated that the penalty would be applicable to 64 individuals; however, the record indicates that a small number of these might be excluded. Therefore, the *estimated* penalty would be $400/month × 64 individuals × 10 months (Sept. 1990—June 1991) = $256,000.

2. The quoted excerpts are taken from the arbitrator's opinion.

in state revenues or productive work hours for state employees. AS 23.40.250(4).

In examining the options set forth by the memorandum, the Commissioner of Administration stated:

The Division of Labor fears the contagion effect for other contracts if this issue is not submitted expressly to the legislature for review and funding.

Ultimately, the State elected not to comply with the deadline the arbitrator set, but instead, to seek legislative funding before implementation. The Commissioner concluded:

[C]onsistent application is necessary to preserve future arguments that monetary terms cannot be implemented for bargaining units absent legislative approval.... [E]ven if [DPS] could absorb this unbudgeted expense, other departments ... would be expected to absorb such costs in the future ...[.]

Accordingly, the State submitted funding of the differential increases to the legislature when it next convened. The legislature approved the increases and appropriated money for them, effective July 1991 retroactive to September 1990.

PSEA maintained that the State should be liable for the penalty for non-payment of the increases from the ordered September 1990 payment date through the time the increases were actually implemented. The State disagreed. When the State did not meet the September 1990 mandated payment date, PSEA filed a grievance. Although the legislature had not approved the increases, PSEA insisted not only that the higher wages be implemented, but also that the penalty for non-payment be assessed.

The Commissioner of Administration denied the request, citing not only AS 23.40.215, but also Article XXXIII of the collective bargaining agreement. Article XXXIII provides that the collective bargaining agreement is to "in all aspects comply with and be subordinate to federal laws and Alaska Statutes." Additionally, the collective bargaining agreement states that "[t]he arbitrator shall not be empowered to rule contrary to ... any of the provisions of this Agreement."

PSEA appealed denial of the grievance. This resulted in the third arbitration proceeding.[3] The parties stipulated to the issue facing the arbitrator:

Is the employer obligated to implement on September 1, 1990, the award of the interest arbitrator on the geographic pay differentials? And, if so, what is the appropriate remedy?

The arbitrator held that the State was obligated to pay the penalty for the delay in implementing the geographic differential increases. He addressed several factors: case law, an attorney general's opinion, and the internal memorandum from the Commissioner of Administration to the Governor's Chief of Staff. The arbitrator's conclusion seemed to be primarily based on case law that interpreted the applicable statutory provisions, and on the appearance that the State's decision not to comply immediately with the order was due to policy considerations rather than concern about statutory compliance. Ultimately, the arbitrator concluded that (1) legislative approval was not required for monetary terms of an agreement that could be implemented by a reallocation of already appropriated funds or resources; (2) the State could have effectuated the pay differentials by this means; and (3) this would have meant a reduction in the work force.

The State filed suit. In its complaint, it requested a declaratory judgment that the arbitration award was unenforceable, and that the arbitration award be vacated. PSEA counterclaimed, alleging a breach of contract. It requested that the arbitration award be upheld. The superior court granted the State's motion for summary judgment, and denied PSEA's cross-motion on its counterclaim. The superior court held that until the legislature made an appropriation for the

3. It is unclear whether the third arbitration proceeding was mandated by AS 23.40.200(b) or by terms of the collective bargaining agreement. Even if it were the latter, inclusion of the arbitration provision is mandated by AS 23.40.210. In either case, the arbitration was compulsory and not voluntary.

increases, there was no shortage; thus no penalty pay was due.

PSEA appeals.

## III. *DISCUSSION*

### A. *Standard of Review*

We have repeatedly held

The standard of review applicable to summary judgments is de novo. Specifically, "summary judgment is affirmed if the evidence in the record fails to disclose a genuine issue of material fact and the moving party is entitled to judgment as a matter of law."

*Dayhoff v. Temsco Helicopters, Inc.,* 848 P.2d 1367, 1369 (Alaska 1993) (quoting *Dayhoff v. Temsco Helicopters, Inc.,* 772 P.2d 1085, 1086 (Alaska 1989)) (citation omitted).

On questions of law, this court is not bound by the lower court's decision.... Our duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy.

*Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

 In arbitrations conducted under Alaska's Uniform Arbitration Act, an arbitrator's findings of fact are unreviewable even in the case of gross error. *Ahtna, Inc. v. Ebasco Constructors, Inc.,* 894 P.2d 657, 661 (Alaska, 1995). An arbitrator's conclusions of law, including conclusions concerning the meaning of the parties' contract, are likewise not reviewable except with respect to questions concerning arbitrability. *Id.* at 11. When arbitrability is the issue, the standard of review concerning questions of law is whether the arbitrator's conclusion is reasonably possible. *Id.* at 12. The Uniform Arbitration Act does not ordinarily apply to arbitration conducted under a labor management contract. AS 09.43.010. The standard of review of grievance arbitration arising out of a labor management contract not subject to the Uniform Arbitration Act is broader than that employed in Uniform Arbitration Act cases. In grievance disputes "gross error" is

the standard. *Nizinski v. Golden Valley Electric Ass'n, Inc.,* 509 P.2d 280, 283 (Alaska 1973). "Gross error" is defined as "only those mistakes which are both obvious and significant." *City of Fairbanks v. Rice,* 628 P.2d 565, 567 (Alaska 1981). Compulsory interest arbitration arising in a labor management contract is subjected to a third and more searching standard.[4] We have adopted the arbitrary and capricious standard for review of awards in compulsory interest arbitrations arising under PERA. *State v. Public Safety Employees Ass'n,* 798 P.2d 1281, 1287 (Alaska 1990). In *Municipality of Anchorage v. Anchorage Police Department Association,* 839 P.2d 1080 (Alaska 1992), we observed that compulsory interest arbitration under the Anchorage Municipal Code would be reviewed under an abuse of discretion standard, a standard that we impliedly equated with the arbitrary and capricious standard. *Id.* at 1088.

In *State v. Public Safety Employees Association,* 798 P.2d 1281 (Alaska 1990), we focused on the reasons why compulsory arbitration should be subjected to more penetrating review than contractual arbitration:

When parties agree to submit their differences to an arbitrator, they should be bound by his decision. Courts should be reluctant to upset arbitrators' awards, lest the advantages of arbitration as a fast and certain means of resolving disputes be lost. Occasional uncorrected errors in arbitrators' decisions are tolerable because the parties have agreed to accept reduced possibilities of appellate review in order to have their dispute resolved quickly and with certainty. Compulsory arbitration is different. The parties have not agreed voluntarily to accept reduced possibilities of appellate review in order to resolve their dispute swiftly. It is by operation of law that the parties are denied their usual right to have their disputes resolved by the courts. Therefore, a standard of review higher than gross error is appropriate.

*Id.* at 1287.

Interest arbitration in the public sector also requires a less deferential standard of

4. Interest arbitration is arbitration which establishes new contract terms. Compulsory arbitration is arbitration mandated by statute. *State v.*

*Public Safety Employees Ass'n,* 798 P.2d 1281, 1283 (Alaska 1990).

review for a separate set of reasons. These reasons relate to the possibility of abuse of the delegated legislative power of setting the salaries and benefits of public employees.

> [T]his is a subject matter area of complexity (i.e. guidance of arbitrators in dealing with the complex and potentially volatile issues that might arise during labor negotiations) which has the capacity for grave and harmful effects on the public welfare.

*Municipality of Anchorage,* 839 P.2d at 1089 n. 20.

The superior court relied upon *Corpus Juris Secundum,* in defining "arbitrary and capricious" as having "no substantial basis for support." This standard does not adequately reflect the increased scrutiny that this court requires when reviewing an award resulting from compulsory interest arbitration.

■ PSEA argues that this court should adopt a definition of "arbitrary and capricious" that is *more deferential* to the arbitrator's decision than even the "gross error" standard. However, adoption of this definition would run contrary to this court's rationale in differentiating between the standards of review we apply to awards resulting from voluntary arbitration on the one hand and compulsory interest arbitration on the other. Compulsory interest arbitration awards are subject to a *more* scrutinizing review than are voluntary arbitration awards. *State v. Public Safety Employees Ass'n,* 798 P.2d 1281, 1287 (Alaska 1990). Accordingly, we reject PSEA's argument that "if an arbitrator has authority to determine the law in construing the parties [sic] bargaining agreement, or setting its terms, the parameters of 'reasonableness' suggest that an arbitrator's decision, if reasonably contemplated within the parties' submissions, will not be arbitrary and capricious if it decides the issue presented."

■ This court has stated:

> The general rule in both statutory and common law arbitration is that arbitrators need not follow otherwise applicable law when deciding issues properly before them, *unless they are commanded to do so by the terms of the arbitration agreement.*

*University of Alaska v. Modern Constr. Inc.,* 522 P.2d 1132, 1140 (Alaska 1974) (emphasis added). The arbitration agreement in issue mandates that the arbitrator must follow the applicable law. The parties provided in the collective bargaining agreement that it

> shall in all aspects comply with and be subordinate to federal laws and Alaska Statutes in effect at the time of the signing of this Agreement or hereafter enacted.

Additionally, the arbitration clause of the agreement states that, "The arbitrator shall not be empowered to rule contrary to ... any of the provisions of this Agreement." Because the terms of the agreement command the arbitrator to follow the applicable law, it is appropriate for this court to consider whether the arbitrator correctly applied the law. *See id.·* We hold that the arbitrary and capricious standard was violated because the arbitrator failed to apply correctly controlling statutory provisions in reaching his decision.

■ The facts of this case provide an additional, similar basis for this court to review the arbitrator's award. As discussed, an arbitrator's determinations must be legally correct when his or her authority comes from an agreement that specifies that it "shall in all respects comply" with the law. Similarly, when arbitration is statutorily compelled, the award resulting from this dispute resolution process should necessarily be in accordance with other provisions contained in that body of legislation. The arbitrator's application of the law must be reviewed. Otherwise, the arbitration award potentially could contravene provisions of the very legislation that mandated the arbitration.

B. *Statutory Requirements and the Arbitrator's Decision*

The trial court observed: "PSEA does not appear to dispute that the penalty provisions are 'monetary terms of an agreement' as defined in AS 23.40.250(4)." Likewise, in its briefing to this court, PSEA does not dispute the contention. However, the arbitrator relied on the perceived ability of the State to reallocate its present appropriation (including reallocating existing resources) to cir-

cumvent the requirement of legislative approval in implementing the differential increase award. In effect this is a ruling that the increase did not fall under "monetary terms of an agreement" as defined by AS 23.40.250(4). The superficial appeal of this argument is undercut by understanding its practical effect. Were the State either free or required to reallocate its present appropriation and resources in this manner, the appropriation power of the legislature would be frustrated.[5]

### C. Case Law and the Statutory Language

██ On its face the language of PERA mandates that "monetary terms of any agreement" entered into under its provisions "are subject to funding through legislative appropriation." AS 23.40.215. Since PSEA does not contend that the geographic differential increases fall outside the definition of a "monetary term of an agreement," the statute appears to compel legislative approval.

Adding significant force to this interpretation of the statutory language are two decisions by this court. In *Public Employees' Local 71 v. State,* 775 P.2d 1062 (Alaska 1989), we held:

> From our independent review of [AS 23.40.215(a)], it is clear that monetary terms of a collective bargaining agreement are not effective until the funds are appropriated by the legislature.

*Id.* at 1064. More specifically, in *State v. Public Safety Employees Association,* 798 P.2d 1281 (Alaska 1990), we implied that it would be acceptable for the legislature not to fund an arbitration award levied under PERA. *See id.* at 1285 n. 7 (encouraging a legislative response to the lack of a statute of limitations for collateral attack on a PERA arbitration award *even though* concerns about finality still would not be completely alleviated, since the legislature might elect not to fund an arbitrator's award). These two cases in combination suggest that if an

arbitration award affects "the monetary terms of any agreement," legislative approval is required before the terms become effective. Hence, penalties for nonpayment would not accrue until the date when legislative approval is obtained.

Despite this combination of statutory language and case law, the arbitrator concluded that legislative approval of differential increases was not required to implement them. To reach this conclusion, the arbitrator found it necessary to give an alternate interpretation to this court's opinion in *Local 71.* The arbitrator rejected the argument that *Local 71* mandated that all monetary terms of a collective bargaining agreement become effective only when they are approved by the legislature, regardless of their fiscal impact. Instead he concluded that "an agency can implement monetary terms with existing funds until the legislature approves the terms and incremental funding (or disapproves them)." To reach this interpretation, the arbitrator gave controlling weight to a footnote in *Local 71,* which cited a superior court holding:

> The superior court for the first judicial district has also held that the monetary terms of an agreement are not enforceable until the legislature appropriates the required funding.

*Local 71,* 775 P.2d at 1064 n. 5 (quoting *Alaska Public Employees Ass'n v. State,* No. 1JU–79–538 Civ. and *Public Employees Local 71 v. State,* No. 1JU–79–983 Civ. (Alaska Super., Dec. 24, 1979)). The arbitrator focused upon the phrase "required funding," and reasoned that the footnote

> supports an interpretation that a union can enforce the provision of benefits that require incremental funding only after the Legislature appropriates the 'required' funding[,] but [the Union] may receive those benefits if the agency can provide them without additional funding.

5. Because we hold that the arbitrator's award was flawed because it violated statutory mandates, it is not necessary for us to address the State's constitutional argument that the arbitration award vitiates the Alaska Constitution's as-

signment of the appropriation function to the legislature. *See Puller v. Municipality of Anchorage,* 574 P.2d 1285, 1288 (Alaska 1978) (in light of statutory construction, court does not reach constitutional issue argued in the appeal).

This analysis [6] is unpersuasive for two reasons.[7] First, the arbitrator has interpreted the footnote without regard to the text that accompanies it, even though it is logical that the text should receive primary emphasis. The text makes it clear that legislative approval is required before any monetary agreement terms become effective. The *Local 71* court did *not* say that "[i]t is clear that monetary terms of a collective bargaining agreement *requiring legislative approval* are not effective until the funds are appropriated by the legislature." The *Local 71* court did not suggest differentiating between agreements that do and do not require legislative approval. This is appropriate, given that the court was interpreting a statute that reads that "monetary terms of *any* agreement entered into under (PERA) are subject to funding through legislative appropriation." [8] AS 23.40.215(a) (emphasis added).

6. The arbitrator's analysis also distinguished *Local 71* on the basis that, unlike the instant case, the legislature did not approve the additional appropriation. The arbitrator reasoned that in *Local 71*, the applicable statutory remedy was for the parties to begin renegotiating the provision; in the instant case, the legislature approved the funding, "thereby opening the liability notion" regarding penalty pay. This argument fails because, as will be discussed, the statutory scheme compels legislative approval before funding of the increases is required; therefore, no penalty can accrue until the legislature properly appropriates for the pay increases.

7. The arbitrator also supported his reasoning by citing the memorandum in which State officials considered the payment of the increases via a reallocation of funds that had already been appropriated by the legislature. Because the State officials contemplated this as an option, the arbitrator concluded that this contemplation was evidence that it was not generally accepted that *all* monetary terms required legislative approval. This logic is flawed. Merely because public officials contemplate taking an action does not by any means indicate that it is lawful to do so.

8. In interpreting *Local 71*, the arbitrator also relied on an Opinion of the Attorney General. In the relevant portion of that opinion, the Attorney General concluded that group health and life insurance benefits for public employees were subject to collective bargaining under PERA. The question arose because the Commissioner of the Department of Administration questioned whether PERA's requirements superseded the group life and health insurance statute and statutes that established the Public Employees Retirement System. 1978 Formal Op. Atty. Gen.

Second, and more importantly, the arbitrator concluded that "absorption of the cost [of the differentials] would require *reductions in force* in a labor-intensive agency on which the public depends for its safety." (Emphasis added.) This invokes the appropriation requirement provisions of AS 23.40.215(a), since "monetary terms of any agreement" include those that "change ... productive work hours for state employees." AS 23.40.250(4). The arbitrator ignored this statutory language. Therefore, on this basis alone, the arbitrator's decision was arbitrary and capricious. He did not consider statutory provisions that prohibit the alternative that he held the State should have pursued.[9]

## IV. CONCLUSION

The arbitrator was bound by applicable law in accordance with the agreement of the

No. 3, at 1 (Jan. 23, 1978). The arbitrator quoted a portion of the opinion which stated:

> To the extent the cost of this negotiated coverage exceeds what the State would have paid under its employer-sponsored plan, the negotiated coverage is subject to legislative approval under AS 23.40.215.

*Id.*

The arbitrator's reliance on this opinion is not persuasive. The opinion indicates that the legislature had already budgeted for some coverage, and that it was any incremental coverage resulting from negotiations that would require separate approval. This is precisely what the State is arguing in this case: that the incremental pay due to the imposition of geographic differential increases requires legislative approval.

9. PSEA also offers a contractual impairment argument based largely on *District 2A v. Government of the Virgin Islands*, 794 F.2d 915 (3d Cir.1986). PSEA argues that the arbitration result is binding on the executive branch, and that the executive branch has an obligation to fulfill its terms, even if the legislature ultimately denies the corresponding appropriation. This rationale misconstrues the holding of *District 2A*. That case did hold that the executive branch could not intentionally circumvent the obligations resulting from binding arbitration *if* the legislature approved funding; however, there was no binding obligation on the State to fulfill the arbitration result if the legislature did not approve the arbitration award funding. "The [Public Employee Labor Relations] Act simply direct[ed] the government, in its capacity as an employer, to pay a salary set by the arbitration panel subject to the Legislature's final approval." *District 2A*, 794 F.2d at 920.

parties. Furthermore, the arbitration proceedings were compelled by statute and were contract formative in nature. The arbitrator's analysis misconstrues and ignores significant statutory provisions from this body of legislation, as well as case law interpreting these statutes. Therefore, the superior court was correct in refusing to enforce the arbitrator's award. The arbitration award was arbitrary and capricious. The judgment of the superior court is AFFIRMED.