UNIVERSITY OF ALASKA CLASSIFIED EMPLOYEES ASSOCIATION, APEA/AFT, AFL–CIO, and Alaska Community Colleges' Federation of Teachers, Local. 2404, American Federation of Teachers, AFL–CIO, Appellants,

v.

UNIVERSITY OF ALASKA, and State of Alaska, Appellees.

No. S–8366.

Supreme Court of Alaska.

Sept. 24, 1999.

William K. Jermain, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellants.

Thomas P. Owens, Jr., and Kimberly K. Geariety, Owens & Turner, P.C., Anchorage, for Appellee University of Alaska.

Kathleen Strasbaugh, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee State of Alaska.

Before MATTHEWS, Chief Justice, EASTAUGH, and BRYNER, Justices. [FABE and CARPENETI, Justices, not participating.]

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Two unions contest the nonpayment and late payment of salary increases due under the terms of their collective bargaining agreements with the University of Alaska. Because Alaska law requires that the legislature appropriate the funds for these pay increases in order for the university to be obligated to pay them, and the legislature made no such appropriations, we affirm the superior court's order granting summary judgment to the University of Alaska and to the state. We remand for the correction of an error in the calculation of attorney's fees.

## II. FACTS AND PROCEEDINGS

The history of the two unions' complaints proceeds separately through the 1995 legislative session. In 1996 the legislature addressed the two union agreements in a joint action.

### A. History of the Complaints

#### 1. The ACCFT

The Alaska Community Colleges' Federation of Teachers, Local 2404, Alaska Federation of Teachers/AFL–CIO (ACCFT) and the University of Alaska completed negotiations on a collective bargaining agreement (CBA) on May 8, 1992, effective from that date until June 30, 1994. When this expiration date neared, ACCFT and the university agreed that they would abide by the terms of that contract until they established a new one.

The CBA dictated that the university would pay ACCFT faculty pursuant to the university regulation in effect at the time of signing. This regulation called for an annual cost-of-living salary increase of three percent. The CBA further provided that "any compensation increases shall be subject to legislative appropriation in accordance with the provisions of AS 23.40.215 and shall be requested separately from compensation increases requested for other employees of the University." Article 12.5 of the CBA, titled "Legislative Appropriation," required that the university "request and actively support full funding of this Agreement" and provided that "any provision of this Agreement requiring legislative action to permit its implementation, by amendment of law or by providing additional funds therefore, shall not become effective until the appropriate legislative body has given approval."

In June 1993 the Regents Board suspended the compensation policy in effect when the parties signed the collective bargaining agreement, and the university refused to pay the raises. ACCFT took the matter to arbitration. In an April 1995 decision the arbitrator concluded that ACCFT was contractually entitled to its three-percent salary increase.

Soon after the ruling, the governor requested the legislature to fund the university's negotiated pay increases for fiscal years 1995 and 1996. The legislature never took action on this request.

#### 2. The CEA

The University of Alaska Classified Employees Association, APEA/AFT, AFL–CIO (CEA) signed a collective bargaining agreement with the university on February 20, 1995, effective from that date until the end of 1997. The agreement included a graded wage schedule that called for an average pay raise of one and one-half percent per year for CEA employees. The CBA also contained a $600 payment to each CEA member. The university requested funding for these provisions in a bill that went to the House on April 11, 1995. But the legislature took no action on this measure.

### B. 1996 Legislative Action

In August 1995 both unions filed superior court complaints claiming that the university

was obligated to pay their raises out of its personnel-services budget.

In November 1995 the university resubmitted its funding request for the CEA raise, but not the ACCFT raise,[1] for fiscal year (FY) 1995. As a "supplemental request," it also sought funding for both unions' FY 1996 raises. The legislature took no action on these measures until June 6, 1996, when it approved the CEA raise for FY 1995 and both unions' raises for FY 1996 and FY 1997.

Meanwhile, the superior court consolidated the unions' suits in March 1996. After the 1996 session the unions proceeded to litigate their claims to the unfunded ACCFT raise for FY 1995 and to the interest accrued on account of CEA's FY 1995 raise being funded over a year and a half after it was supposed to go into effect. The superior court granted the university and the state's joint cross-motion for summary judgment. The unions appeal.

## III. DISCUSSION

### A. Standard of Review

■■■ We review a grant of summary judgment de novo, applying our independent judgment.[2] The parties agree that there are no material issues of fact before the court. In reviewing issues of law, the court will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[3]

### B. The Parties' Arguments

■■ Relying on the arbitrator's ruling, the unions argue that ACCFT's members are entitled to their negotiated FY 1995 cost-of-living increase. They also argue that CEA's members are due interest on their late-approved FY 1995 increase. The university and the state respond that no monetary term of a multi-year public-sector collective bar-

gaining agreement is enforceable unless the legislature makes a specific appropriation for each year. Because the legislature did not specifically fund the cost-of-living raises in dispute here, the university and the state argue, no contractual obligation exists that the arbitrator, or this court, could enforce.

The unions concede that the legislature maintains exclusive control over appropriations and can refuse to fund a pay raise. But they distinguish between legislative rejection of a request for funding and legislative inaction on that request—contending that only the latter occurred with the ACCFT raise. The unions point out that when the legislature appropriated funds for the university's FY 1995 budget, the university received unrestricted funds in several budget categories that it could properly have applied to pay the CBA's cost-of-living increases. The unions argue that absent a specific vote by the legislature refusing to fund these increases, they must be deemed to have been appropriated when the legislature approved the university's budget. The unions further argue that because the legislature specifically appropriated funds for CEA's raise but did so after that raise was due, the university should have to pay interest accruing from the due date specified in the CBA and running to the time of actual payment.

### C. The Unions' FY 1995 Pay Raises and Interest Claim

The Public Employment Relations Act (PERA)[4] governs collective bargaining agreements between public employees and public employers in Alaska.[5] Alaska Statute 23.40.215(a) specifically provides that "[t]he monetary terms of any agreement entered into under [PERA] are subject to funding

---

1. The university's failure to request funding for the ACCFT fiscal year 1995 raise at this time was apparently based on communication from legislative leadership that the legislature had already rejected the measure and would not reconsider it. The university's request for a CEA raise, however, was embodied in a bill still pending from the prior legislative session.

2. See Christensen v. NCH Corp., 956 P.2d 468, 474 (Alaska 1998).

3. Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

4. AS 23.40.070–.260.

5. The parties do not dispute that the CBAs at issue here cover public employees and are thus governed by this statute.

through legislative appropriation." [6] The plain language of this provision suggests that the monetary terms of ACCFT's CBA do not become effective unless and until the legislature specifically funds them. The statute does not direct the legislature to take action on a request for funding; nor does it provide for funding by default in the event of legislative inaction. Rather, it simply hinges the effectiveness of the monetary terms of any public-sector CBA on legislative funding.[7]

Our decisions interpreting PERA have consistently upheld the statute's plain meaning.[8] In *Public Safety Employees Association, Local 92 v. State (PSEA )*,[9] for instance, the state agreed to pay union members statutorily mandated geographic-differential salary increases, but it withheld payment pending legislative appropriation.[10] Because the CBA's deadline for commencement of payment passed before the legislature funded the agreement, an arbitrator penalized the state for late payment, ruling that it could have paid the salary increases by the CBA's deadline by drawing money from other sources in its existing budget.[11]

But we overruled the arbitrator's decision, expressly disapproving the notion that a state agency can "circumvent the requirement of legislative approval" [12] by reallocating its existing resources:

> The superficial appeal of this [position] is undercut by understanding its practical effect. Were the State either free or required to reallocate its present appropriation and resources in this manner, the appropriation power of the legislature would be frustrated.[13]

We therefore concluded that the state had no obligation to pay the agreed geographic salary differentials—even though they were statutorily mandated—until the legislature actually appropriated the necessary funding.[14]

■ *PSEA* thus directly conflicts with the unions' argument here that the ACCFT's FY 1995 salary increases, which the legislature never specifically funded, should nonetheless be deemed "appropriated" because the university could have paid them out of its gener-

6. AS 23.40.215 provides:
 (a) The monetary terms of any agreement entered into under AS 23.40.070—23.40.260 are subject to funding through legislative appropriation.
 (b) The Department of Administration shall submit the monetary terms of an agreement to the legislature within 10 legislative days after the agreement of the parties, if the legislature is in session, or within 10 legislative days after the convening of the next regular session. The legislature shall advise the parties by concurrent resolution if it approves or disapproves of the monetary terms within 60 legislative days after the agreement is submitted to the legislature. The approval of the monetary terms of an agreement under this subsection is a nonbinding, advisory expression of legislative intent. If within 60 legislative days after the agreement is submitted the legislature advises the parties by concurrent resolution that it disapproves the monetary terms of the agreement, the parties may resume negotiations.
 (c) Notwithstanding (b) of this section, the monetary terms of an agreement entered into between a school district or regional educational attendance area and its employees are not subject to approval by the legislature.
 The parties do not dispute that the terms of the CBAs at issue in this case are "monetary terms" falling under subsections (a) and (b) of this provision.

7. AS 23.40.215(b) does establish a procedure allowing the legislature to approve or reject by concurrent resolution the monetary terms of newly-negotiated public-sector collective bargaining agreements. But this procedure does not call on the legislature to approve or reject funding; instead it enables the legislature to approve or reject newly-negotiated monetary terms in substance, providing that if the legislature disapproves, "the parties may resume negotiations." Moreover, any action that the legislature takes under this procedure is merely "a nonbinding, advisory expression of legislative intent." AS 23.40.215(b); *see supra* note 6.

8. In this respect Alaska law differs from that of other states. *See* Steven F. Befort, *Public Sector Bargaining: Fiscal Crisis and Unilateral Change*, 69 Minn. L.Rev. 1221 (1985) (comparing how laws of different states allocate responsibilities between the legislature and the executive in the administration of public-sector union contracts).

9. 895 P.2d 980 (Alaska 1995).

10. *See id.* at 983.

11. *See id.*

12. *Id.* at 985–86.

13. *Id.* at 986.

14. *See id.*

al budget.[15] *PSEA* likewise undermines the unions' argument that the university owes interest on CEA's late-funded FY 1995 raise. In recognizing that monetary terms do not become effective until the legislature funds them, *PSEA* expressly held that "penalties for nonpayment [do] not accrue until the date when legislative approval is obtained."[16]

 Our decision in *Public Employees' Local 71 v. State of Alaska*[17] also upheld AS 23.40.215(a)'s plain meaning. We ruled that a legislative appropriation funding monetary terms in one year of a multi-year collective bargaining agreement does not oblige a public employer to pay according to those terms in subsequent years.[18] By making it clear that only a specific vote of approval will satisfy AS 23.40.215(a)'s requirement of "funding through legislative appropriation," *Local 71* confirms our conclusion that the university need not pay ACCFT's FY 1995 increases because the legislature never funded them and that it need not pay interest on CEA's late-funded FY 1995 increases because they fell due only when the legislature funded them.[19]

### D. *Attorney's Fees*[20]

 The parties agree that the trial court erred in calculating attorney's fees. The university concedes that when it adjusted its fees in response to the unions' claim of improper billing, it neglected to submit an amended order, and the superior court did not notice the mistake. This error, though small from a financial standpoint, should be corrected.[21]

### IV. *CONCLUSION*

We AFFIRM the judgment of the superior court on all counts except for its attorney's fees award. On that count, we REMAND for a recalculation of the award.

---

**15.** The unions also argue that the arbitrator's decision in ACCFT's favor obligated the university to pay the raise and that the superior court erred in failing to confirm the arbitration award, as required under AS 09.43.110. But on this score Alaska law is well settled that arbitration awards are subject to legislative appropriation under PERA. *See Fairbanks Police Dep't v. City of Fairbanks*, 920 P.2d 273, 274–75 (Alaska 1996); *PSEA*, 895 P.2d at 986; *State v. Public Safety Employees Ass'n*, 798 P.2d 1281, 1285 n. 7 (Alaska 1990). Thus, even assuming that AS 09.43.110 required the superior court to confirm the arbitrator's award, any error was harmless, since there is no enforceable remedy.

**16.** *PSEA*, 895 P.2d at 986.

**17.** 775 P.2d 1062 (Alaska 1989).

**18.** *See id.* at 1064; *see also Fairbanks Police Dep't*, 920 P.2d at 275 n. 2 (ruling that "[s]ubsection 215(a) ... allows the legislature to make that choice [of whether to fund an agreement] in several stages, as each item of a negotiated result requires funding").

**19.** We find no merit in the unions' claims that the denial of their pay raises violates the federal and state Equal Protection Clauses or the First Amendment right to freedom of association. The unions provide nothing to indicate that the university or state denied them raises as a result of specific disadvantages inflicted on them as organized labor or as a penalty for organizing as unions. And we decline to address the unions' impairment-of-contracts claim, because we find they have inadequately briefed it. "[W]here a point is given only cursory statement in the argument portion of a brief, the point will not be considered on appeal." *A.H. v. W.P.*, 896 P.2d 240, 243 (Alaska 1995) (internal quotations omitted) (quoting *Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991)).

**20.** We review a trial court's award of attorney's fees for abuse of discretion. *See Municipality of Anchorage v. Gallion*, 944 P.2d 436, 446 n. 19 (Alaska 1997).

**21.** *See* Alaska R. Civ. P. 60(a) (permitting a trial court to correct a clerical mistake on remand).