*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | Supreme Court No. S-14701 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-04522 CI |
| v. | ) | |
| | ) | O P I N I O N |
| PUBLIC SAFETY EMPLOYEES | ) | |
| ASSOCIATION, | ) | No. 6903 – May 2, 2014 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: William Milks, Assistant Attorney General, and Michael C. Geraghty, Attorney General, Juneau, for Appellee. Stephen F. Sorensen, Simpson, Tillinghast, Sorensen & Sheehan, P.C., Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.
MAASSEN, Justice, with whom STOWERS, Justice, joins, dissenting.

I.      INTRODUCTION

An Alaska state trooper was discharged for having consensual sex with a domestic violence victim the morning after assisting in the arrest of the victim's husband. The Public Safety Employees Association (PSEA), the labor organization that represents

the Alaska State Troopers, filed a grievance under its collective bargaining agreement with the State of Alaska. The matter went to arbitration. The arbitrator ordered that the trooper be reinstated with back pay after a three-day suspension, concluding that the State did not have just cause to discharge the trooper. The superior court upheld the arbitrator's order of back pay but decided that it could not enforce the ordered reinstatement because the Alaska Police Standards Council had by this point revoked the trooper's police certificate. The State now appeals, arguing that the arbitrator committed gross error and that the arbitrator's order is unenforceable as a violation of public policy.

The keys to this appeal are the level of deference we accord the arbitrator and the very limited nature of the public policy exception. The State and PSEA's collective bargaining agreement provided for binding arbitration to resolve employee grievances regarding disciplinary actions. We generally will not disturb the results of a binding arbitration, even where we would reach a different conclusion were we to review the matter independently. Because no statute, regulation, or written policy prohibited supervisors from engaging in progressive discipline of the trooper, in lieu of discharging him for his misconduct, the arbitrator's decision to impose discipline rather than uphold the termination does not violate any explicit, well-defined, and dominant public policy. Because the arbitrator's award is neither unenforceable nor grossly erroneous, we affirm the superior court's decision to uphold the arbitration award in part.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

The following facts are based on the record, the arbitration decision, and the opinion of the superior court. "[W]e give great deference to an arbitrator's decision,

including findings of . . . fact."[1] The Trooper-Grievant was discharged on November 2, 2009. The discharge was based on misconduct that occurred in April 2009, a little over a year after the Trooper-Grievant first entered the trooper training academy and less than two months after he started his position as a state trooper. The Trooper-Grievant entered the trooper academy as a recruit in February 2008, undergoing four months of "training in a variety of subjects including Criminal Code, Domestic Violence, First Aid, Handgun Radar, Search & Seizure, Handgun, and Traffic Stops." Following field training and the completion of his probationary period, the Trooper-Grievant was promoted to the position of Alaska State Trooper in March 2009.

In April 2009 the Trooper-Grievant engaged in the misconduct that led to this case. At the time, he was 24 years old. On April 19 the Trooper-Grievant responded to a request by Trooper C for backup.[2] Trooper C had been dispatched to victim M.H.'s house after another trooper, Trooper G, asked the dispatch center to request a welfare check on M.H. Trooper G, who was an acquaintance of M.H., had received calls from her that day possibly indicating that there was a domestic disturbance at her house and that she needed assistance.

When Trooper C arrived at M.H.'s house, M.H. appeared to be afraid of her husband, J.H. The husband was intoxicated and became physically aggressive toward Trooper C, who then called for backup. Upon his arrival, the Trooper-Grievant aided Trooper C in restraining J.H. and in transferring him to Trooper C's car. Trooper C interviewed M.H., who reported that J.H. had not struck her but had

---

[1]     *State v. Pub. Safety Emps. Ass'n*, 235 P.3d 197, 201 (Alaska 2010) (*PSEA 2010*).

[2]     To protect the victim's privacy and the confidentiality of personnel records under AS 39.25.080(a), we do not identify the victim, her husband, or the troopers involved in the incident.

threatened her verbally and put her in fear.  M.H. reported that J.H. was upset about her receiving phone calls from Trooper G, and M.H. noted that J.H. believed she was being unfaithful to him.  The Trooper-Grievant was present for portions of Trooper C's interview with M.H.

After Trooper C finished interviewing M.H., he asked the Trooper-Grievant to go over a pamphlet on domestic violence and victim's rights with her while Trooper C interviewed M.H.'s daughter in another part of the house.  According to testimony by the Trooper-Grievant and M.H., "[M.H.] flirted with [the Trooper-Grievant] as he read her the victim's rights information."  M.H. asked the Trooper-Grievant for his personal cell phone number, but he refused to provide it to her.  Meanwhile, Trooper C arrested J.H. and charged him with assault on both M.H. and Trooper C.

At the end of his shift, at approximately 1:00 a.m., the Trooper-Grievant returned home and went to sleep.  At about 5:30 a.m., the Trooper-Grievant woke up, obtained M.H.'s cell phone number from his trooper notebook, and sent a text message to M.H.  The Trooper-Grievant told M.H. that he could give her his personal phone number now that he was off duty.  M.H. called the Trooper-Grievant, and after some discussion the Trooper-Grievant drove to her house in his personal car and out of uniform, arriving at about 6:00 a.m.  According to the arbitrator's findings, when the Trooper-Grievant arrived, "M.H. was still upset.  She expressed her feeling that she was 'done with' her marriage."  M.H. and the Trooper-Grievant proceeded to have consensual sex.

M.H. later told J.H. about her sexual encounter with the Trooper-Grievant. J.H. told his defense attorney, who in turn told the assistant district attorney.  The District Attorney's Office investigated, and both M.H. and the Trooper-Grievant confirmed that the encounter had taken place.  Ultimately the charge of assault on Trooper C was dropped and the charge of assault on M.H. was reduced to harassment.  The District

Attorney's Office made these decisions based on several considerations, including the Trooper-Grievant's sexual encounter, M.H. and J.H.'s reconciliation, and the fact that M.H. was not a cooperative witness. The arbitrator found that there was evidence that the sexual encounter had a "minimal" impact on the District Attorney's charging decisions.

The State conducted an administrative investigation of the incident, during which the Trooper-Grievant remained on duty. The investigating officer concluded that the Trooper-Grievant had violated sections of the Department of Public Safety Operating Procedure Manual. The Trooper-Grievant's supervising officer, Captain Dennis E. Casanovas, recommended suspension rather than termination. Captain Casanovas recognized that the Trooper-Grievant had been progressing well despite his young age and lack of prior law enforcement experience. In forming his recommendation, Captain Casanovas relied on both his extensive previous experience as an investigation coordinator and his personal knowledge of the Trooper-Grievant's work capabilities. But the Director of the State Troopers, Colonel Audie Holloway, overruled Captain Casanovas and decided to discharge the Trooper-Grievant. The resulting termination letter informed the Trooper-Grievant that he had violated the Operating Procedure Manual sections 101.010(B), 101.020(G), 101.070(A), and 101.070(B).[3] The letter

---

[3] The Department of Public Safety Operating Procedure Manual section 101.010(B) provides that "[t]he standards of conduct set out in this chapter do not prohibit every possible act that constitutes unacceptable behavior. Conduct that shocks the conscience or that violates generally recognized standards of professional behavior is forbidden." Operating Procedure Manual section 101.020(G), which concerns "Canons of Police Ethics" with regard to private conduct, provides:

> The law enforcement officer shall be mindful of his special
> identification by the public as an upholder of the law. Laxity
> of conduct or manner in private life, expression of either

(continued...)

stated that "despite your knowledge of this woman's vulnerable condition after her recent domestic violence victimization, you put yourself, this agency, the District Attorney's Office and the criminal prosecution of this case in jeopardy by surrendering to the temptations of a sexual encounter." The letter also characterized the Trooper-Grievant's conduct as "shocking" and "a discredit" to the Department of Public Safety.

## B.    Proceedings

Following the termination, both the Trooper-Grievant and the State sought further action. The Trooper-Grievant filed a grievance challenging his discharge under

---

[3](...continued)

> disrespect for the law or seeking to gain special privilege, reflects unfavorably upon the police officer and the police service. The community and the service require that the law enforcement officer lead the life of a decent and honorable man. Following the career of a policeman gives no man special perquisites. It does give the satisfaction and pride of following and furthering an unbroken tradition of safeguarding the American republic. The officer who reflects upon this tradition will not degrade it. Rather he will so conduct his private life that the public will regard him as an example of stability, fidelity, and morality.

Operating Procedure Manual section 101.070(A) provides:

> Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which brings the Department into disrepute, or reflects discredit upon the employee as a member of the Department, or that which impairs the operations or efficiency of the Department or employee.

Operating Procedure Manual section 101.070(B) provides that "[e]mployees shall conduct their personal and business affairs in a manner that does not discredit or otherwise bring the department into disrepute or compromise the employee's ability to perform his or her duties."

his union's collective bargaining agreement, and the dispute proceeded to arbitration.[4] While the arbitration was in process, the State sought revocation of the Trooper-Grievant's basic police certificate from the Alaska Police Standards Council, the regulatory and quasi-judicial body charged with establishing minimum selection and training standards for police officers.[5] This certificate is a requirement for every state trooper.[6]

In December 2010 the arbitrator issued her decision. She found that the Trooper-Grievant had "engaged in unprofessional conduct and showed poor judgment." Yet she also found that the State had not fulfilled its duty to inform the Trooper-Grievant about the parameters of acceptable behavior. The arbitrator noted that past instances of sexual misconduct had not resulted in terminations, that just cause required consistent disciplinary action, and that the State must inform troopers if the policy has shifted to zero-tolerance. Finally, the arbitrator determined that the Trooper-Grievant's conduct did not rise to the level of egregious behavior and that the principles of progressive discipline thus required the opportunity for rehabilitation. Finding that the Trooper-Grievant had not been discharged for just cause, the arbitrator ordered that he be reinstated with back pay and converted his discharge to a three-day suspension.

---

[4] *See* AS 23.40.210(a) ("The agreement shall include a grievance procedure which shall have binding arbitration as its final step."); AS 23.40.200(a)(1), (b).

[5] *See* AS 18.65.130; AS 18.65.220; AS 18.65.240; *see generally* DEPARTMENT OF PUBLIC SAFETY, *History*, ALASKA POLICE STANDARDS COUNCIL, http://dps.alaska.gov/apsc/history.aspx (last visited Mar. 21, 2014).

[6] *See* 13 Alaska Administrative Code (AAC) 85.010(b)(3)(A) (2012) ("A participating police department may not hire as a police officer a person . . . who . . . has had the person's basic certification revoked . . . .").

In January 2011 the State filed a complaint in superior court to vacate the arbitration award. Before the superior court case could be resolved, however, an administrative law judge heard the police certificate revocation action and issued his decision on April 12, 2011. The Police Standards Council had proposed two grounds for revocation: (1) lack of good moral character under 13 AAC 85.110(a)(3), and (2) a discharge "for cause for inefficiency, incompetence, or some other reason that adversely affects the ability and fitness of the police officer to perform job duties or that is detrimental to the reputation, integrity, or discipline of the police department" under 13 AAC 85.110(a)(2).

The administrative law judge determined that the Police Standards Council had a valid basis to revoke the Trooper-Grievant's police certificate. But the administrative law judge found the first of the council's two proposed grounds for revocation, lack of good moral character, to be unfounded. The administrative law judge found that revocation was in fact warranted on the second ground, which allows revocation of a certificate for an officer who has been discharged on one of the grounds contained in 13 AAC 85.110(a)(2).[7] On May 6, 2011, the Police Standards Council voted to revoke the Trooper-Grievant's certificate.[8]

_____

[7] The administrative law judge found that the arbitrator's order of reinstatement did not preclude the State from revoking the Trooper-Grievant's license based on the original discharge. 13 AAC 85.110(f) provides that "[a] personnel action or subsequent personnel action regarding a police officer by the police officer's employer, including a decision resulting from an appeal of the employer's action, does not preclude the council from revoking the police officer's basic, intermediate, or advanced certificate under this section."

[8] The Trooper-Grievant appealed the revocation to superior court, but moved to dismiss the appeal in July 2011. The superior court accordingly dismissed the appeal in August 2011.

On May 9, 2011, the State filed a motion, asking the superior court to vacate the arbitration award because it was contrary to public policy and because it resulted from gross error. The superior court asked the parties to provide supplemental briefing on the effect of the Police Standards Council's revocation. In its supplemental briefing, the State argued that because a basic certificate is a requirement to be an Alaska State Trooper, the Trooper-Grievant could not be lawfully reinstated and thus the arbitration award could not be enforced.

Superior Court Judge Mark Rindner concluded that the arbitration award was not the result of gross error. The superior court additionally determined that the award could not be vacated under the public policy exception to the enforcement of arbitration awards "because the State does not have an explicit, well defined, and dominant public policy that prohibits employing a person as an Alaska State Trooper who has a consensual sexual encounter with a crime victim." The superior court nevertheless held that it could not fully enforce the arbitration award, given that requiring reinstatement "would violate the regulatory requirement that the [Trooper-Grievant] have a basic [police] certificate."[9] The superior court stated that it would only "enforce the Award to the extent it can be consistent with Alaska law." The superior court ordered "that the portions of the arbitrator's award providing for the payment of lost wages and benefits after May 6, 2011 [when the Police Standards Council revoked his police certificate] and for the reinstatement of the former employee are not enforced." The superior court upheld the part of the award granting back pay between the date of the Trooper-Grievant's termination and the date that his certificate was revoked.[10]

---

[9]     The superior court noted that "courts will not enforce contractual terms that directly violate legislation or regulations promulgated under valid legislation."

[10]     The superior court also stated that "it may not necessarily agree with the
(continued...)

The State appeals, arguing that (1) the arbitration award should be vacated in full as contrary to public policy and (2) in the alternative, the arbitration award should be vacated in full for gross error.

## III. STANDARD OF REVIEW

We articulated the relevant standard of review in *PSEA 2010*:

> We review de novo the superior court's decision to confirm the arbitration award. Both the common law and Alaska statutes evince a strong public policy in favor of arbitration. In order to encourage parties to pursue arbitration, Alaska courts have a policy of minimizing their interference with arbitration decisions. Thus, we give great deference to an arbitrator's decision, including findings of both fact and law. We will only vacate an arbitration award arising out of a collective bargaining agreement where it is the result of gross error — those mistakes that are both obvious and significant. We will not vacate such an award merely because we would reach a different decision ourselves. This deferential standard is key to the decision we reach today.[11]

## IV. DISCUSSION

### A. The Arbitration Award Is Not Unenforceable As A Violation Of Public Policy.

The State argues that the arbitration award should be vacated as contrary to public policy "because it is in conflict with the Alaska Police Standards Council's decision to revoke the trooper's police certification, and because the nature of the trooper's conduct undermines the public's interests in a police force that acts to protect

---

[10](...continued) arbitrator's decision or find that it would have ruled in the same manner had this been a case of first impression."

[11]   235 P.3d 197, 201 (Alaska 2010) (internal quotation marks and citations omitted).

the public and the integrity of the criminal justice system." In essence, the State contends that reinstatement violates public policy because the Trooper-Grievant's underlying conduct was repugnant and because that conduct violated the public policy requiring "that law enforcement officers act with the primary purpose of protecting the public in general and crime and domestic violence victims in particular" and "that officers be persons of integrity and high moral character." But the correct question is not whether the Trooper-Grievant's *conduct* violated public policy; rather, it is whether the *arbitration award* of reinstatement with back pay itself violates an "explicit, well-defined, and dominant public policy."[12] Although we cannot disagree with the State that the Trooper-Grievant's conduct was censurable, we also cannot overturn an arbitrator's decision if that decision does not violate an explicit, well-defined, and dominant public policy. We therefore must affirm the superior court's decision to uphold the arbitrator's award in part.

### 1. *PSEA 2011* and Alaska's public policy exception to the enforcement of arbitration awards

In *PSEA 2011* we considered as a matter of first impression whether to adopt a public policy exception to the enforcement of arbitration awards.[13] We decided to recognize this exception, holding that it applied where enforcement of the arbitration

---

[12]    *See State v. Pub. Safety Emps. Ass'n*, 257 P.3d 151, 161 (Alaska 2011) (*PSEA 2011*).

[13]    *Id.* at 155-56. While the question of a public policy exception to arbitration awards had been raised in prior cases, this court did not previously have the opportunity to reach the issue, either finding that the issue had not been properly raised below or deciding the case on other grounds. *See PSEA 2010*, 235 P.3d at 203; *Alaska Pub. Emps. Ass'n v. State, Dep't of Envtl. Conservation*, 929 P.2d 662, 667 (Alaska 1996).

decision " 'would violate an explicit, well defined, and dominant public policy.' "[14] In formulating this definition, we drew on the United States Supreme Court's approach to the public policy exception to the enforcement of arbitration awards.[15] The public policy exception derives from the common-law principle that a court may refuse to enforce illegal contracts.[16] Accordingly, we noted in *PSEA 2011* that this formulation of the

---

[14] *PSEA 2011*, 257 P.3d at 158 (quoting *PSEA 2010*, 235 P.3d at 203). This court laid out three "common principles," drawn from other jurisdictions, that should be used in the public policy exception analysis:

> (1) the public policy exception to labor arbitration disputes involving public employees in positions of public trust is most clearly applicable where a statute or regulation compels the termination (or prevents the hiring) of an employee for committing the relevant misconduct; (2) the relevant inquiry is whether the arbitrator's decision to reinstate the employee violates public policy, not whether an employee's conduct does, so statutes or regulations that merely prohibit the conduct are insufficient to support the public policy exception; and (3) a court should be particularly vigilant where the employee's misconduct was in the performance of his or her duties and directed toward the public, and could therefore undermine confidence in public institutions that rely upon the public's trust.

*Id.* at 162.

[15] *See id.* at 156 (citing *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 67 (2000)).

[16] *See W.R. Grace & Co. v. Local 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983) (citing *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948)) (holding enforcement of collective bargaining agreement would not violate public policy requiring obedience to court decisions or policy favoring voluntary compliance with Title VII of the Civil Rights Act of 1964).

exception is consistent with our previous holdings on the unenforceability of contracts.[17] In *Pavone v. Pavone*, we adopted the *Restatement (Second) of Contracts* § 178 in its analysis of the public policy exception to the enforcement of contracts.[18] This section of the *Restatement* provides: "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."[19]

The United States Supreme Court has made clear that the public policy exception to the enforcement of arbitration awards must be narrow and that the public policy at issue "must be explicit, well defined, and dominant . . . [and] [i]t must be ascertained by reference to the laws and legal precedents and *not from general considerations of supposed public interests*."[20] In addition, the Supreme Court warned courts to "approach with particular caution pleas to divine further public policy" in a field in which other political branches have already created a regulatory regime.[21] Following the United States Supreme Court's approach, the test we adopted in *PSEA 2011* "establish[es] a high hurdle for the vacatur of arbitration awards" due to this

---

[17]     *PSEA 2011*, 257 P.3d at 158-59.

[18]     *Id.* at 159 (discussing *Pavone v. Pavone*, 860 P.2d 1228, 1231 (Alaska 1993)).

[19]     RESTATEMENT (SECOND) OF CONTRACTS § 178(1) (1981).

[20]     *E. Associated Coal Corp.*, 531 U.S. at 62 (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)) (emphasis added) (internal quotation marks omitted).

[21]     *Id.* at 63 (upholding arbitration order to reinstate truck driver who tested positive for drugs).

court's "longstanding recognition of Alaska's 'strong public policy in favor of arbitration.' "[22]

We emphasized in *PSEA 2011* that "the relevant inquiry is whether the arbitrator's *decision* to reinstate the employee violates public policy, not whether an employee's *conduct* does, *so statutes or regulations that merely prohibit the conduct are insufficient to support the public policy exception.*"[23] In applying this rule to the facts of *PSEA 2011*, where an arbitrator reinstated a trooper who had lied about performing a prohibited maneuver at an out-of-state motorcycle training program,[24] we provided the following analysis:

> All of the preceding sources support the conclusion that it is Alaska's policy to maintain an honest police force. But there has never been a question that it is against public policy for a police officer to lie. The question is whether it is against Alaska's public policy to reinstate a police officer who has lied as the Trooper did in the present case.[25]

---

[22]     *PSEA 2011*, 257 P.3d at 160 (quoting *Baseden v. State*, 174 P.3d 233, 237 (Alaska 2008)); *see also* AS 23.40.210(a) ("The agreement shall include a grievance procedure which shall have binding arbitration as its final step."); AS 23.40.200(a)(1), (b).

[23]     *PSEA 2011*, 257 P.3d at 162 (emphases added); *see also E. Associated Coal Corp.*, 531 U.S. at 62-63 ("[T]he question to be answered is not whether [the grievant's] drug use itself violates public policy, but whether the agreement to reinstate him does so."); *City of Boston v. Boston Police Patrolmen's Ass'n*, 824 N.E.2d 855, 861 (Mass. 2005) (citing *City of Lynn v. Thompson*, 754 N.E.2d 54, 62-63 (Mass. 2001)) ("To prevail, the city must therefore demonstrate that public policy requires that [the grievant's] conduct, as found by the arbitrator, is grounds for dismissal, and that a lesser sanction would frustrate public policy.").

[24]     *See PSEA 2011*, 257 P.3d at 153.

[25]     *Id.* at 161.

We ultimately characterized the question as being whether there is a "categorical requirement in Alaska public policy for the termination of officers who engage in relatively minor forms of dishonesty."[26]

In this case, the question is not whether the Trooper-Grievant's conduct is against public policy. Rather, the relevant inquiry is whether a decision to use progressive discipline and to continue the employment of a trooper who has engaged in this type of sexual misconduct is a violation of an explicit, well-defined, and dominant public policy.

Focusing selectively on language from *PSEA 2011*, the dissent contends that our formulation of the public policy exception to the enforcement of arbitration awards requires that we make a broader inquiry than we do here. The dissent calls attention to provisions in the *Restatement* that we cited in *PSEA 2011* as part of our general discussion of whether to adopt the public policy exception.[27] Of particular importance to the dissent are *Restatement* provisions suggesting that in some contexts a court may hold an arbitration award unenforceable even where no explicit public policy requires that result.[28]

But in focusing on our reference to these provisions of the *Restatement*, the dissent ignores the overall thrust of *PSEA 2011*. As we observed then, the *Restatement* provides "both general guidelines for determining unenforceability on public policy grounds and more specific guidelines for making this determination in various commonly

---

[26] *Id.*

[27] Dissent at 38-40 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 178(1) (1981)).

[28] *Id.*

recurring contexts."[29] Our express holding in *PSEA 2011* was that "reviewing arbitration awards by determining whether there is an explicit, well-defined, and dominant public policy against enforcement reflects how the general Restatement rules operate in the recurring context of arbitration awards."[30] We established this high bar for vacatur of arbitration awards to incorporate the "special public interest in the enforcement of arbitration decisions . . . given our longstanding recognition of Alaska's strong public policy in favor of arbitration."[31] Only taken out of context can the portions of the *Restatement* cited in *PSEA 2011* on which the dissent focuses suggest that we favor substantial latitude in vacating arbitration awards on the basis of our own ideas of desirable public policy. We clearly recognized in *PSEA 2011* the special importance of arbitration, and we consequently strictly limited the scope of review of arbitration awards. Our decision today corresponds with that limited review.

### 2. The reinstatement of the Trooper-Grievant is not unenforceable as a violation of Alaska public policy.

We begin by considering whether there is "legislation specifically prohibiting enforcement of the promise or contractual term."[32] In our analysis, we "look to the entire body of law in the State of Alaska for evidence . . . to determine . . . public policy."[33] The State does not point to any law or regulation that specifically prohibits the

---

[29] *PSEA 2011*, 257 P.3d at 159.

[30] *Id.* at 160 (internal quotation marks omitted).

[31] *Id.* at 159-60 (internal citations and quotation marks omitted).

[32] *Id.* at 160 (quoting *Pavone v. Pavone*, 860 P.2d 1228, 1231 (Alaska 1993)) (internal quotation marks omitted).

[33] *Id.* (omissions in original) (quoting *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1132 (Alaska 1989)) (internal quotation marks omitted).

employment or reinstatement of a trooper who has engaged in sexual misconduct when that trooper still has a police certificate. Rather, the State focuses on five sources of authority that it argues justify the public policy exception and prohibit the Trooper-Grievant's *conduct*: (1) the Alaska Constitution; (2) case law; (3) statutes and regulations; (4) the Department of Public Safety's Operating Procedures Manual; and (5) *PSEA 2011*'s principles of public trust and heightened vigilance.[34] But the State's focus is misguided. Again, the relevant inquiry is not whether the officer's conduct violated public policy but rather whether the arbitrator's award violates an explicit, well-defined, and dominant public policy.[35] The public policies cited by the State do not compel termination. And the State has not directed us to any public policy that would have compelled the termination of a trooper for the misconduct at issue at the time of the arbitration. Indeed, the State clearly had the authority — and it was in fact the recommendation of the Trooper-Grievant's supervisor — to use progressive discipline rather than to discharge the Trooper-Grievant. No statute or internal regulation

---

[34] In addition, the State claims that the Alaska Police Standards Council's "decision to revoke the Trooper-Grievant's certification reaffirms that reversing the officer's discharge was contrary to public policy." After the arbitrator ordered reinstatement, the council revoked the Trooper-Grievant's certification based on the underlying "discharg[e] for conduct that adversely affected his ability and fitness to act as a police officer, and that [was] detrimental to the reputation and integrity of the Alaska State Troopers." According to the State, the certificate revocation shows that the arbitrator's decision to reverse the discharge violated public policy. But this argument is somewhat circular. Because the certificate revocation was based on the discharge that the arbitrator found lacked just cause, it is difficult to see how it can supply the justification for rejecting the arbitrator's decision.

[35] *See PSEA 2011*, 257 P.3d at 162.

prohibited the use of progressive discipline in this case.[36]  Because the collective

bargaining agreement provided for binding arbitration,[37] the arbitrator also had the

authority to impose progressive discipline.  The arbitrator's order of reinstatement after

suspension, therefore, cannot be characterized as a violation of public policy.

### a.  Alaska's Constitution

The State cites article I, sections 1, 12, and 24 of the Alaska Constitution.

Article I, section 1 provides that all persons are "entitled to equal rights, opportunities

and protection under the law."  Article I, section 12 states that "[c]riminal administration

shall be based upon the following:  the need for protecting the public . . . [and] . . . the

rights of victims of crimes."  Article I, section 24 provides that "[c]rime victims . . . shall

have the following rights . . . the right to be reasonably protected from the accused

through the imposition of appropriate bail or conditions of release by the court . . .

[and] . . . the right to be treated with dignity, respect, and fairness during all phases of the

criminal and juvenile justice process."  But these constitutional provisions do not evince

the requisite explicit, well-defined, and dominant public policy to terminate a trooper for

the specific conduct in this case.

---

[36]    Counsel for the State acknowledged that there is no statute or regulation specifically prohibiting reinstatement of a trooper who has engaged in this type of misconduct when the trooper still has the requisite police certificate.  Rather, counsel claimed that the relevant public policy is the trooper's basic duty to protect the public, based on a combination of constitutional, statutory, and regulatory principles.

[37]    *See* AS 23.40.210(a) ("The agreement shall include a grievance procedure which shall have binding arbitration as its final step.").

### b. Case law

Next the State relies on our decision in *Jones v. Jennings*.[38] *Jones*, however, involved the State's interest in public disclosure of alleged police misconduct including assault, battery, and false imprisonment.[39] And our decision addressed privilege and the officer's right to privacy, not the public policy exception in the context of arbitration awards.[40] Our statement that there is a public interest in "insur[ing] that police behavior conforms to the code of conduct required of a democratic society" does not constitute an explicit, well-defined, or dominant public policy.[41] The State also cites to *PSEA 2010*.[42] But our brief commentary on the State's public policy argument in *PSEA 2010* is not sufficient evidence of an explicit public policy that applies to the allowable discipline in this case.[43]

### c. Statutes and regulations

The State cites statutes and regulations concerning the Department of Public Safety's Council on Domestic Violence and Sexual Assault and minimum standards for employment as a police officer. The State points to AS 18.66.010, which establishes the Council on Domestic Violence and Sexual Assault. The mandate of the council includes

---

[38]     788 P.2d 732 (Alaska 1990).

[39]     *See id.* at 733-35.

[40]     *See id.* at 735-39.

[41]     *Id.* at 739; *see PSEA 2011*, 257 P.3d at 160 (concluding that *Jones* did not establish a public policy against reinstatement of a dishonest police officer).

[42]     235 P.3d 197, 203 (Alaska 2010).

[43]     *See id.*

planning and coordinating services for domestic violence victims.[44] The State argues that AS 18.66.010 is an example of how "[t]he State's strong public policy requiring the protection of crime victims is evident in our state's commitment to preventing domestic violence." It is true that this statute expresses the State's public policy of aiding domestic violence victims.[45] Yet the statute does not give any indication that reinstating a trooper who has engaged in sexual misconduct is against public policy.[46] As such, the statute is insufficient to invoke the public policy exception.

The State also notes statutory and regulatory provisions that allow it to establish minimum standards for police officers and revoke the certificate of an officer who does not meet these standards.[47] Alaska Statute 18.65.240(c) merely provides that the Alaska Police Standards Council "*may* . . . revoke the certificate of a police officer who does not meet the standards adopted under (a)(2) of this section," including the qualification of moral character. (Emphasis added.) The legislature's use of "may" rather than "shall," in conjunction with the State's past use of progressive discipline of troopers who engaged in sexual misconduct, indicates that there is no absolute requirement for the discharge of troopers who have engaged in this type of misconduct.

In addition, the State cites 13 AAC 85.110(b)(3), which provides that the State shall revoke the certificate of an officer who was discharged "for conduct . . . that would cause a reasonable person to have substantial doubt about an individual's honesty,

---

[44]     *See* AS 18.66.010.

[45]     *See id.* (establishing the Council on Domestic Violence and Sexual Assault to "provide for planning and coordination of services to victims of domestic violence or sexual assault . . . and to provide for crisis intervention and prevention programs").

[46]     *See id.*

[47]     *See, e.g.*, AS 18.65.130; AS 18.65.240(c); 13 AAC 85.100(a), (b); 13 AAC 85.110(a)(2), (3).

fairness, and respect for the rights of others and for the laws of this state and the United States or that is detrimental to the integrity of the police department where the police officer worked." In *PSEA 2011* we concluded that while this same regulation "strongly suggests that it is the policy of the State of Alaska not to employ dishonest police officers . . . it is unclear whether the regulation means to prohibit the employment of police officers who have been dishonest to any degree or under any circumstance."[48] Similarly, these requirements do not make clear whether the regulation categorically prohibits the employment of troopers who engaged in consensual sexual misconduct.[49]

The dissent takes up the argument where the State leaves off, contending that 13 AAC 85.110(b)(3) is "more than sufficient" as an expression of public policy to justify disturbing the arbitrator's decision here.[50] We cannot agree. If a court could reject an arbitration decision simply because it concludes that the conduct at issue falls into the broad categories of undesirable behavior described in 13 AAC 85.110(b)(3), the court would owe an arbitrator's decision little deference. There are countless acts that are not grounds for termination — much less mandatory termination — but that nevertheless might be "detrimental to the integrity of the police department" or might be matched with one of the other generalities found in 13 AAC 85.110(b)(3). Under the

---

[48] *PSEA 2011*, 257 P.3d 151, 161 (Alaska 2011).

[49] We also note that the Alaska Police Standards Council did not base revocation of the Trooper-Grievant's police certificate on this provision. Rather, the council revoked his police certificate under 13 AAC 85.110(a)(2), which provides that the council will, in its discretion, revoke a certificate if the officer "has been discharged . . . for cause for inefficiency, incompetence, or some other reason that adversely affects the ability and fitness of the police officer to perform job duties or that is detrimental to the reputation, integrity, or discipline of the police department where the police officer worked."

[50] Dissent at 42.

dissent's view, a court should be empowered to reject an otherwise valid arbitration award solely on the basis that the conduct at issue could reasonably fit into one of those catch-all categories.

This view would make nonsense of our statement in *PSEA 2011* that the public policy exception does not permit a court to reject an arbitration decision merely because the court might have decided the case differently.[51] In that case it was undisputed that the officer lied to his superiors — conduct that we did not hesitate to call "unworthy of an Alaska state trooper."[52] The officer's lying would almost certainly cause a reasonable person to have substantial doubt about the officer's honesty. Given the nature of the conduct about which the officer lied — carrying out a prohibited motorcycle stunt — a reasonable person would likely also have substantial doubt about the officer's respect for the law. The integrity of the police department would reasonably be in question as well. Yet we declined to overturn the arbitrator's reinstatement of the officer because the gross error standard sets a higher bar.[53] If 13 AAC 85.110(b)(3) were an expression of public policy sufficient to reject an arbitration decision, the gross error standard would be meaningless; a court could invalidate arbitration awards far more freely than that standard allows.

The dissent further argues that by finding general statements such as 13 AAC 85.110(b)(3) insufficient, we now require the other branches of government to

---

[51] As we wrote in *PSEA 2011*, "If we had stood in the arbitrator's place, we may well have determined that under Alaska's doctrine of 'just cause,' the State did have just cause to terminate the Trooper. . . . But we are bound by the gross error standard, and it was not gross error for the arbitrator to have taken a different approach from the one we may have taken." 257 P.3d at 165.

[52] *Id.* at 166.

[53] *Id.*

draw unrealistically precise lines beyond which misconduct is intolerable as a matter of public policy.[54] But while we require more from the State than the vague directives at issue here, we do not demand the "luminous detail" that the dissent suggests will now be needed.[55] The State does not have to detail precisely the forms that sexual misconduct may take or the circumstances in which it could take place. It does not have to define in advance all the ways that employees may misbehave. But if the State wishes to bar categorically the reinstatement of officers discharged for sexual misconduct, it must make a policy to that effect. In the absence of such a policy, this court will not disturb a duly reached arbitration award.

### d.      Internal regulations

The State cites the Department of Public Safety's Operating Procedures Manual. In particular, the State highlights sections that prohibit behavior that "shocks the conscience or that violates generally recognized standards of professional behavior" or that "brings the Department into disrepute . . . or . . . impairs the operations or efficiency of the Department."

The State's argument, though, is contradicted by our holding in *PSEA 2011*, where the State relied on a section of the Operating Procedures Manual that requires employees to respond truthfully to their superiors and to questioning during official investigations.[56] While we recognized the requirements laid out by the Operating Procedures Manual, we explained that "the Manual says nothing about the kind of informal investigation during which the Trooper lied, and in general stops short of

---

[54]     Dissent at 42-43.

[55]     *Id.* at 43.

[56]     *See PSEA 2011*, 257 P.3d at 161.

-23-                                                      6903

discussing the consequences of dishonesty."[57] Again, the Operating Procedures Manual sections at issue in this case do not clearly concern circumstances similar to the Trooper-Grievant's misconduct. And more importantly, these Operating Procedures Manual sections do not dictate disciplinary consequences for this type of misconduct. Because no internal regulation prohibited the State from imposing discipline short of termination in response to the misconduct, it was also within the arbitrator's discretion to order reinstatement and discipline of the Trooper-Grievant.

### e. The principles of public trust and heightened vigilance

One of the considerations that we discussed in *PSEA 2011* is that the court "should be particularly vigilant where the employee's misconduct was in the performance of his or her duties and directed toward the public, and could therefore undermine confidence in public institutions that rely upon the public's trust."[58] The State argues that the Trooper-Grievant's misconduct falls within this category of cases and thus warrants special scrutiny. PSEA responds that the State has not terminated other troopers whom PSEA alleges have engaged in similar misconduct.

We acknowledge that the underlying conduct in this case involved the trooper's duties to the public. But the public policy exception still requires an explicit, well-defined, and dominant public policy even in a case involving a trooper's performance of duties directed toward the public. For example, other courts have held that the public policy exception applied in cases of police officers' inappropriate behavior with a minor boy in violation of state statute[59] and misconduct involving false

---

[57]    *Id.*

[58]    *Id.* at 162.

[59]    *See Police Officers Labor Council v. City of Wyoming*, No. 258843, 2006
(continued...)

arrests, false charges, and perjury.[60] And even before we recognized the public policy exception, we reversed an arbitrator's award of reinstatement of a public employee who was discharged for a serious crime, having been convicted of a felony involving violation of public trust.[61] But in the case before us, the public policy exception does not apply because although the Trooper-Grievant's misconduct was censurable, the arbitrator's order reinstating him does not violate any explicit, well-defined, and dominant public policy.

We recognize that while arbitrations in this type of case often involve egregious employee misconduct that may affect public safety, reinstatements in such cases are not always against public policy.[62] In particular, courts have upheld

---

[59](...continued)
WL 2000136, at *1-2 (Mich. App. July 18, 2006) (concluding that the arbitration order of reinstatement was contrary to a Michigan statute prohibiting a person from encouraging a child to engage in delinquent acts and a police regulation).

[60]     *See City of Boston v. Boston Police Patrolmen Ass'n*, 824 N.E.2d 855, 861 (Mass. 2005) ("The question to be answered is not whether [the officer's conduct] itself violates public policy, but whether the agreement to reinstate him does so.") (citations omitted) (quoting *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62-63 (2000)).

[61]     *See Alaska State Emps. Ass'n/AFSCME Local 52 v. State*, 74 P.3d 881 (Alaska 2003) (reversing reinstatement where employee was discharged upon revelation of felony conviction for theft of public funds).

[62]     *See City of Worcester v. Worcester Vocational Teachers Ass'n*, No. 981686B, 1999 WL 1336075, at *1, *3-4 (Mass. Super. Ct. March 3, 1999) (upholding arbitrator's award to reinstate school guidance counselor despite alleged sexually harassing comments and physical contact with a student); *City of Cleveland v. Cleveland Police Patrolman's Ass'n*, No. 76181, 2000 WL 573195, at *1, *3-4 (Ohio App. May 11, 2000) (affirming arbitrator's reinstatement of police officer convicted of domestic assault even though a federal statute prohibited persons convicted of misdemeanor domestic
(continued...)

reinstatement of law enforcement officers who had consensual sex with a witness or informant.[63] For example, in an unpublished decision, an Ohio appellate court upheld an arbitrator's reinstatement of a deputy sheriff who had been discharged for initiating and then engaging in consensual sexual conduct with a confidential informant while on duty and in uniform because the act was not criminal and there was no statute or case law mandating discharge.[64] Similarly, the Michigan Court of Appeals upheld an arbitrator's reinstatement of a police officer who had "engaged in an improper consensual act of a sexual nature with the complaining witness after responding to her call for assistance and while on duty."[65] In that case, after the officer had an on-duty sexual encounter with the individual who had called for assistance, the officer failed to note his visit in his log book

---

[62](...continued)
violence from possessing firearms).

[63]    *See, e.g., Bureau of Maine State Police v. Pratt*, 568 A.2d 501, 505-06 (Me. 1989) (holding that arbitrator's reinstatement of officer who had sexual encounter with witness and then possibly perjured himself on the topic did not violate public policy); *City of Lincoln Park v. Lincoln Park Police Officers Ass'n*, 438 N.W.2d 875, 876 (Mich. App. 1989) (holding that enforcement of arbitrator's order to reinstate the police officer did not violate public policy even though the officer had engaged in consensual sexual conduct with a complaining witness after responding to her call for help); *Monroe Cnty. Sheriff v. Fraternal Order of Police*, No. 869, 2002 WL 31170168, at *1 (Ohio App. Sept. 25, 2002) (upholding arbitrator's order to reinstate the deputy sheriff who had engaged in consensual sexual conduct with confidential informant while in uniform and on duty).

[64]    *See Monroe Cnty. Sheriff*, 2002 WL 31170168, at *1, *7 (noting that the conduct could be seen as "an abuse of power" but nonetheless upholding the reinstatement of the deputy sheriff because there was no clearly defined public policy prohibiting employment of the deputy sheriff).

[65]    *Lincoln Park Police Officers Ass'n*, 438 N.W.2d at 876.

and failed to file an incident report.[66] In response to questions the following day, the officer lied about the sexual act.[67] But because the arbitrator's reinstatement was based on the collective bargaining agreement and the penalty of discharge was optional, the court affirmed the arbitrator's order to reinstate the officer.[68]

In sum, although the question of the public policy exception may arise more frequently when employee conduct affects the public trust, the award will fall into the exception only if the award itself violates an explicit, well-defined, and dominant public policy. All of the State's sources support the conclusion that Alaska has a policy to protect victims and prohibit sexual misconduct. But the question is not whether the Trooper-Grievant's misconduct violated public policy; it is whether it is against Alaska's public policy to use a progressive disciplinary sanction such as suspension for a trooper who engaged in this misconduct. The State has not pointed to any explicit, well-defined, and dominant public policy requiring termination, rather than suspension, as the only proper discipline for a trooper's consensual and non-criminal sexual misconduct. In fact, as the arbitrator found, incidents of sexual misconduct often have been punished with disciplinary sanctions short of termination.[69] The discipline and reinstatement of such a trooper, therefore, is not a violation of public policy.

---

[66]    *See id.*

[67]    *See id.*

[68]    *See id.* at 877.

[69]    *See PSEA 2010*, 235 P.3d 197, 201-03 (Alaska 2010) (upholding arbitrator's order for reinstatement and suspension of officer who had harassed a fellow officer at a law enforcement academy).

**B.      The Arbitrator Did Not Commit Gross Error In Concluding That There Was Not Just Cause To Discharge the Trooper-Grievant.**

The State also claims that the arbitrator's decision constituted gross error. We have defined gross error as "only those mistakes which are both obvious and significant."[70]  Because we conclude that the arbitrator did not commit gross error, we affirm the superior court's decision to uphold the arbitrator's award.

**1.      The arbitrator did not commit gross error in interpreting the collective bargaining agreement.**

The State first challenges the arbitrator's interpretation of the term "egregious misconduct."  The collective bargaining agreement provides the following definition:  "Egregious misconduct which *may result in discharge* includes, but is not limited to, gross disobedience or insubordination, dishonesty, chemical or alcohol intoxication at the workplace, physical misconduct, criminal conduct, abusive or lewd behavior, or abandonment of duties." (Emphasis added.)  Relying on this definition, the arbitrator explained that "[e]gregious behavior that warrants summary discharge includes extremely serious behavior such as stealing, striking a foreman, persistent refusal to obey a legitimate order and dishonesty.  Less serious infractions of plant rules or of proper conduct such as insolence, call for some milder penalty aimed at correction."

The State argues that the arbitrator committed gross error because she allegedly used her own definition of egregious misconduct instead of the definition provided by the collective bargaining agreement.  PSEA responds that "[i]t is clear that throughout her decision [the arbitrator] was applying the correct standard set out in the Collective Bargaining Agreement as she discussed in great length and in detail the level

---

[70]      *Pub. Safety Emps. Ass'n, Local 92 v. State*, 895 P.2d 980, 984 (Alaska 1995) (quoting *City of Fairbanks v. Rice*, 628 P.2d 565, 567 (Alaska 1981)) (internal quotation marks omitted).

of misconduct by the Grievant and similar acts of misconduct by other Troopers." PSEA is correct.

While arbitrators must adhere to the plain language of the contract, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award."[71] In addition, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."[72] The arbitrator has broad authority to interpret the collective bargaining agreement: "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law — the practices of the industry and the shop — is equally a part of the collective bargaining agreement although not expressed in it."[73] And "if the arbitrator's construction is plausible, it must not be disturbed."[74] Here, we need only ask whether

---

[71] *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960).

[72] *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *see also United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581-82 (1960); *Manville Forest Prods. Corp. v. United Paperworkers Int'l Union*, 831 F.2d 72, 76 (5th Cir. 1987) (approving of the use of past practice "to resolve ambiguities and gaps in written collective bargaining agreements").

[73] *Warrior & Gulf Nav. Co.*, 363 U.S. at 581-82; *see also Manville Forest Prods. Corp.*, 831 F.2d at 75.

[74] *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 700 F.3d 891, 902 (6th Cir. 2012); *see also Loveless v. E. Air Lines, Inc.*, 681 F.2d 1272, 1278 n.14 (11th Cir. 1982) ("An arbitrator may be able to discern a latent ambiguity in a contract based upon his examination of past practice or bargaining history even though no ambiguity appears on the face of the contract. The arbitrator might then be able to resolve the latent ambiguity by resort to permissible sources of extrinsic evidence.").

the arbitrator's construction of the collective bargaining agreement constitutes an "obvious and significant" mistake.[75] We conclude that the arbitrator's construction was not gross error.

In her decision, the arbitrator interpreted the collective bargaining agreement definition to determine whether the Trooper-Grievant's misconduct was serious enough to constitute "[e]gregious misconduct" warranting discharge. The arbitrator relied on Captain Casanovas's testimony and the Trooper-Grievant's "honest and forthright and sincere[]" responses during the hearing to assess the seriousness of his conduct, reasoning that "[w]hy a grievant did what he or she did inevitably relates to the gravity of the misconduct." The arbitrator found that "[t]here is no evidence to indicate that [the Trooper-Grievant's] behavior could not be corrected," concluding that, "[b]ased on the State's disciplinary approach in similar situations, this type of conduct has warranted an opportunity to correct the behavior." Accordingly, the arbitrator expressly disagreed with Colonel Holloway's interpretation of "[e]gregious misconduct" and determined that the Trooper-Grievant's "unprofessional conduct" and "poor judgment" did not rise to the level of "[e]gregious behavior . . . warrant[ing] summary discharge" under the collective bargaining agreement.

Again, our standard for reviewing an arbitrator's decision is "very deferential."[76] We review only for gross error.[77] And because the arbitrator analyzed whether the Trooper-Grievant's misconduct rose to "[e]gregious misconduct which may result in discharge" under the collective bargaining agreement and the State's

---

[75]    *See Pub. Safety Emps. Ass'n, Local 92*, 895 P.2d at 984.

[76]    *See PSEA 2010*, 235 P.3d 197, 202 (Alaska 2010).

[77]    *See id.*

disciplinary practices in cases of sexual misconduct, we cannot conclude that the arbitrator's analysis was gross error.

Moreover, we have held that "an arbitrator's 'use of a well-reasoned alternative definition' of just cause 'would not alone constitute gross error.' "[78] Therefore, the arbitrator was not bound by this court's definition of just cause.[79] Under our definition of "just cause," the termination would have been affirmed.[80] But because we apply a deferential standard of review and because the arbitrator analyzed whether the Trooper-Grievant's misconduct rose to "[e]gregious misconduct" warranting discharge, we conclude the arbitrator's interpretation of the collective bargaining agreement was not gross error.

> **2.** **The arbitrator did not commit gross error in the disparate treatment analysis.**

The State challenges the arbitrator's disparate treatment analysis. First, the State argues that the disparate treatment analysis was inappropriate because it could lead to toleration of police officer misconduct. Second, the State claims that the "record evidence did not support the arbitrator's conclusion" for several reasons: (1) some of the cases were from the 1990s; (2) many of the cases involved greater discipline than a three-day suspension; and (3) the cases involved less severe misconduct that did not

---

[78]     *PSEA 2011*, 257 P.3d 151, 163 (Alaska 2011) (quoting *Alaska State Emps. Ass'n/AFSCME Local 52 v. State*, 74 P.3d 881, 884 (Alaska 2003)).

[79]     *See id.*

[80]     We defined "just cause" for discharge as "one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." *Alaska State Employees Ass'n/AFSCME Local 52*, 74 P.3d at 883-84 (quoting *Manning v. Alaska R.R. Corp.*, 853 P.2d 1120, 1125 (Alaska 1993)) (internal quotation marks omitted).

mirror the misconduct in this case. Finally, the State contends that the arbitrator failed to explain how the three-day suspension is consistent with past disciplinary action and that the record does not provide support for the propriety of this penalty.

In raising the concern of employer leniency toward misconduct, the State relies on *PSEA 2011* and decisions from other jurisdictions.[81] But while we cautioned in *PSEA 2011* that the "disparate treatment doctrine should not operate as a one-way ratchet toward the acceptance of increasingly unethical behavior," we also noted that "it was not gross error for the arbitrator to have taken a different approach from the one we may have taken."[82] Reasoning that the State cannot "deviate from the negotiated agreement by implementing zero tolerance for an offense that has previously been addressed through progressive discipline," the arbitrator concluded that if the State decides to implement a new zero-tolerance policy for sexual misconduct, it must provide notice to its employees.

The State also attempts to distinguish the other cases relied on by the arbitrator as involving less severe misconduct or more serious punishments. We will vacate the arbitrator's award only if there was an obvious and significant mistake.[83] Here, the arbitrator analyzed a number of cases varying in specific misconduct and severity. The State terminated the trooper in only one out of the eight cases involving

---

[81] *See, e.g.*, *Town of Bloomfield v. United Elec. Radio & Mach. Workers of Am.*, 916 A.2d 882, 885 (Conn. Super. Ct. 2006), *rev'd on other grounds*, 939 A.2d 561 (Conn. 2008); *City of Boston v. Boston Police Patrolmen's Ass'n*, 824 N.E.2d 855, 862 n.9 (Mass. 2005).

[82] *PSEA 2011*, 257 P.3d at 165.

[83] *See PSEA 2010*, 235 P.3d 197, 201 (Alaska 2010).

sexual misconduct.[84]  The State imposed less severe discipline in all other instances of sexual misconduct, including:  a trooper's inappropriate sexual contact in the trooper office while on duty; sexual harassment of and an inappropriate personal relationship with the trooper's supervisee; a trooper instructor's signing a woman's breast at a bar in front of trooper recruits; a trooper's inappropriate sexual advances; a trooper's sexual relationship with a nineteen-year-old intoxicated woman while the trooper was supposed to investigate her criminal complaint of sexual abuse by her stepfather; a trooper's extramarital "sexual relationship with an adult female from the village while on a village visit on official travel for the Department"; and a trooper's "sexual relationship with the daughter of a murder victim during an ongoing investigation."  And in the only case of sexual misconduct that resulted in a termination, there were allegations of both inappropriate sexual conduct and dishonesty.[85]  Moreover, the record reviewed by the arbitrator suggests that the State still uses progressive discipline, including short periods of suspension, in cases of sexual misconduct.  The arbitrator did not commit an obvious and significant error in her analysis.

Finally, the State claims that the arbitrator failed to explain why the three-day suspension is consistent with the past disciplinary actions.  But the arbitrator relied on Captain Casanovas's testimony and recommendation of a disciplinary suspension, which was based on his extensive experience with administrative investigations.  The arbitrator further explained that, based on her findings, progressive discipline was appropriate because it was possible for the Trooper-Grievant to rehabilitate himself.  The

---

[84]    An arbitrator later reinstated the trooper, finding that the State did not bear its burden in proving that the alleged misconduct had occurred.  However, the relevant facts here concern the State's initial disciplinary action, not the arbitration award.

[85]    In that sole termination case, an arbitrator found the State did not have just cause for termination and ultimately reinstated the trooper.

arbitrator noted that Captain Casanovas recommended suspension rather than termination after "carefully weigh[ing] . . . his knowledge of the [Trooper]-Grievant's work progression . . . and . . . the likelihood of the [Trooper]-Grievant's correcting his behavior." The arbitrator's reliance on the testimony of Captain Casanovas, who supervised the Trooper-Grievant and had personal knowledge of the Trooper-Grievant's work capabilities, does not meet our standard for gross error.[86]

## V. CONCLUSION

The Trooper-Grievant's misconduct was extremely serious and offensive. If we had been deciding this case it is likely that we would have concluded that under Alaska law, the State had "just cause" to discharge the Trooper-Grievant. Engaging in sexual conduct with a victim shortly after responding to her call for help, even if consensual, is inappropriate behavior for a state trooper. But we may "not vacate . . . an award merely because we would reach a different decision ourselves."[87] Because there is no explicit, well-defined, and dominant public policy in Alaska prohibiting reinstatement of a law enforcement officer who has engaged in off-duty consensual sexual misconduct, and because the arbitrator did not commit gross error, we AFFIRM the superior court's decision to uphold the arbitrator's award in part.

---

[86] The State also contends that "[t]he arbitrator failed to take into account the critical importance of public trust in the State Troopers," but that argument is subsumed within our public policy discussion. *See supra* Part IV.A.2.e.

[87] *PSEA 2010*, 235 P.3d at 201.

MAASSEN, Justice, with whom STOWERS, Justice, joins, dissenting.

I respectfully dissent. I would hold that a contractual arbitration remedy requiring that a state trooper be reinstated after his commander has, *with very good reason*, lost confidence in the trooper's judgment, moral character, and effectiveness as a law enforcement officer violates Alaska public policy. I recognize that the public policy exception to the enforcement of arbitration awards is sparingly applied. But the court today requires an unrealistic degree of precision from the codes of acceptable conduct that other branches of government are entitled to expect their employees to follow.

The arbitrator found in this case (and the court appropriately defers to its findings) that the Trooper-Grievant was called to the home of M.H. to provide backup for another trooper, Trooper C, who was investigating a report of domestic violence; that M.H.'s husband, because he believed M.H. was being unfaithful to him with yet another state trooper (Trooper G), had "threatened her and placed her in fear"; that it was the Trooper-Grievant's duty to read and explain to M.H. her rights as a victim of domestic violence while Trooper C interviewed another witness in another part of the house; that the troopers arrested M.H.'s husband and took him to jail; that early the next morning the Trooper-Grievant, now off-duty, texted M.H. and provided her with his personal telephone number; that after talking with M.H. on the telephone he returned to her home out of uniform at 6:00 a.m., where he found her to be "still upset" and "feeling that she was 'done with' her marriage"; and that the Trooper-Grievant and M.H. then had consensual sex in her home, while her husband was in jail on charges that he had

-35-                                                                      6903

assaulted her the night before because of jealousy prompted by her suspected adultery with a state trooper.[1]

The court also accepts that the fact of this sexual encounter became known to the husband and his defense attorney, and that it had some impact, albeit "minimal," on the district attorney's decision to drop an assault charge based on the husband's encounter with Trooper C and to reduce to harassment the assault charge involving M.H.[2]

The court also recites the governing police standards of conduct alerting officers that "every possible act that constitutes unacceptable behavior" cannot be spelled out explicitly; that "[c]onduct that shocks the conscience or that violates generally recognized standards of professional behavior is forbidden"; and that how officers conduct themselves in their professional and private lives, "both on and off duty," is subject to the same high standards of honor and decency.[3] The court quotes the resulting termination letter to the Trooper-Grievant stating that "despite your knowledge of this woman's vulnerable condition after her recent domestic violence victimization, you put yourself, this agency, the District Attorney's Office and the criminal prosecution of this case in jeopardy by surrendering to the temptations of a sexual encounter" and characterizing the Trooper-Grievant's conduct as "shocking" and "a discredit" to the Department of Public Safety.[4]

---

[1] Op. at 3-4.

[2] *Id.* at 5.

[3] *Id.* at 5, n.3.

[4] *Id.* at 5-6.

The court further acknowledges that Alaska's constitution, statutes, and regulations "support the conclusion that Alaska has a [public] policy to protect victims and prohibit sexual misconduct."[5] It concludes, however, that none of these legal sources articulates "an explicit, well-defined, and dominant public policy" that would bar reinstatement of the Trooper-Grievant despite his reprehensible conduct.

## A. The Court Too Narrowly Defines Its Role In Identifying Public Policy.

I begin my legal analysis, as the court does, with a recitation of the three "common principles" that our precedent requires us to consider:

> (1) the public policy exception to labor arbitration disputes involving public employees in positions of public trust is *most clearly applicable* where a statute or regulation compels the termination (or prevents the hiring) of an employee for committing the relevant misconduct; (2) the relevant inquiry is whether the arbitrator's decision to reinstate the employee violates public policy, not whether an employee's conduct does, so statutes or regulations that merely prohibit the conduct are insufficient to support the public policy exception; and (3) a court should be *particularly vigilant* where the employee's misconduct was in the performance of his or her duties and directed toward the public, and could therefore undermine confidence in public institutions that rely upon the public's trust.[6]

That the public policy exception is "*most clearly applicable* where a statute or regulation compels the [employee's] termination" necessarily means that the exception may also apply, though less "clearly" so, where a statute or regulation does *not* compel the

---

**5** *Id.* at 27. *See also id.* at 18 ("Article I, section 24 provides that '[c]rime victims . . . shall have . . . the right to be treated with dignity, respect, and fairness during all phases of the criminal and juvenile justice process.' "); *id.* at 20 ("It is true that [AS 18.66.010] expresses the State's public policy of aiding domestic violence victims.").

**6** Op. at 12, n.14 (quoting *State v. Pub. Safety Emps. Ass'n*, 257 P.3d 151, 162 (Alaska 2011) (*PSEA 2011*)) (emphasis added).

termination. This is consistent with the Restatement law from which we drew our guiding principles. In *PSEA 2011*, relying on our earlier decision in *Pavone v. Pavone*,[7] we highlighted the Restatement's recognition that

> [o]nly infrequently does legislation, on grounds of public policy, provide that a [contract] term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived *either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability.*[8]

We elaborated on this point in *PSEA 2011* by reciting more extensively, and approvingly, from the same Restatement comment:

> In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms. . . . Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term.[9]

---

[7] 860 P.2d 1228, 1231 (Alaska 1993).

[8] 257 P.3d at 159 (emphasis added) (quoting *Pavone*, 860 P.2d at 1231 (quoting RESTATEMENT (SECOND) OF CONTRACTS §178(2) cmt. b (1981))).

[9] *Id.* at 159 n.38 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 178(2) cmt. b (1981)).

And we explicitly stated in *PSEA 2011* that our decision in that case was "consonant with the general guidance offered in *Pavone*" and with the Restatement principles on which *Pavone* was decided.[10]

Because of this express sourcing of our guiding principles, endorsed in *PSEA 2011*,[11] I cannot read *PSEA 2011* as requiring in every case that there be explicit direction from the executive or legislative branch that the specific conduct at issue prohibits hiring or reinstatement. Rather, in that broad middle ground of "doubtful cases" between those in which "unenforceability is plain" and those in which "the contravention is so trivial that it plainly does not preclude enforcement," we are expected to do "a careful balancing,"[12] keeping in mind that in those "doubtful cases" there is unlikely to be any express legislative or regulatory direction. The court operating in that middle ground must rely instead on its own historical ability to derive the relevant "explicit, well-defined, and dominant public policy" "either from its own perception of

---

[10]     *Id.* at 159-60.

[11]     Today's opinion faults my analysis for relying too heavily on the Restatement principles we endorsed in *PSEA 2011*. Op. at 15-16. We expressly adopted the test of Restatement § 178 in *Pavone*, holding that in future cases, when faced with ambiguous public policy, "we will apply the factors listed in subsections 2 and 3 of [Restatement] section 178 to determine whether the term should be enforced." 860 P.2d at 1232. These sections do not even apply unless "there is no legislation specifically prohibiting enforcement of the promise or contractual term." *Id.* at 1231. In *PSEA 2011* we stated that the public policy exception to the enforcement of arbitration awards that we were adopting was consistent with *Pavone*. *PSEA 2011*, 257 P.3d at 158-59. The basic principles about the unenforceability of illegal contracts should not apply in only a watered-down version in the context of public employee arbitration awards, where the public interest in judicial review is considerably *greater* than it is with private contracts.

[12]     *PSEA 2011*, 257 P.3d at 159 n.38 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 178 cmt. b (1981)).

the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability."[13]

## B. Public Policy Requires That The Trooper-Grievant Not Be Retained.

Blinkered to the breadth of the allowable inquiry, the court today looks for — and fails to find — "any explicit, well-defined, and dominant public policy requiring termination, rather than suspension, as the only proper discipline for a trooper's consensual and non-criminal sexual misconduct."[14] But while the phrase "consensual and non-criminal sexual misconduct" is useful shorthand for discussion purposes, it omits everything that establishes the gravity of the Trooper-Grievant's misconduct: sex by a responding officer with a distraught domestic-violence victim within hours of the alleged crime, likely leaving her in a *more* vulnerable position when the encounter came to light (particularly as her husband's anger stemmed in the first place from her alleged unfaithfulness with another trooper), damaging the State's prosecution of the husband for the crime of domestic violence, damaging the State's prosecution for the assault on Trooper C, and damaging the Trooper-Grievant's future effectiveness as a witness.

As noted above, the court today agrees that the sources of authority on which the State relies "support the conclusion that Alaska has a [public] policy to protect victims and prohibit sexual misconduct."[15] I would go a step further: I believe one of

---

[13]     *Id.* at 159 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 178 cmt. b (1981)).

[14]     Op. at 27.

[15]     *Id. See also id.* at 18 ("Article I, section 24 provides that '[c]rime victims . . . shall have . . . the right to be treated with dignity, respect, and fairness during all phases of the criminal and juvenile justice process.' "); *id.* at 20 ("It is true that [AS 18.66.010] expresses the State's public policy of aiding domestic violence victims.").

those sources, 13 AAC 85.110(b), supports the conclusion that a police officer who violates that public policy in a clearly serious way should no longer be employed. That regulation provides:

> The council shall revoke a basic, intermediate, or advanced certificate upon a finding that the holder of the certificate. . . (3) has been discharged, or resigned under threat of discharge, from employment as a police officer in this state or any other state or territory for conduct that would cause a reasonable person to have substantial doubt about an individual's honesty, fairness, and respect for the rights of others and for the laws of this state and the United States or that is detrimental to the integrity of the police department where the police officer worked.[16]

Discussing this regulation in *PSEA 2011*, we acknowledged that it "strongly suggests that it is the policy of the State of Alaska not to employ dishonest police officers," but we concluded that it was "unclear whether the regulation means to prohibit the employment of police officers who have been dishonest to any degree or under any circumstance."[17] I believe this to be a slight misconstruction of the regulation and one we are mistaken to carry forward. The regulation is indeed very clear that it means to prohibit the employment of police officers who have been dishonest (or who have engaged in sexual misconduct or the exploitation of domestic violence victims or the misuse of their official position) to some degree and under some circumstances; that is, where the conduct, whatever it is, "would cause a reasonable person to have substantial doubt about an individual's honesty, fairness, and respect for the rights of others and for the laws of this state and the United States or that is detrimental to the integrity of the police department where the police officer worked." A "reasonable person" standard is

---

16     13 AAC 85.110(b).

17     257 P.3d at 161.

common in the law and presumed to be generally understood.[18]  I find the regulatory language to be more than sufficient to satisfy the Restatement's guiding principles for determining public policy, particularly the instruction that in "doubtful cases" we conduct a "careful balancing" of the interests in favor and against enforcement of the award.[19]  One of those interests, poignant under the facts of this case, we highlighted in *PSEA 2011*:  that we "be particularly vigilant where the employee's misconduct was in the performance of his or her duties and directed toward the public, and could therefore undermine confidence in public institutions that rely upon the public's trust."[20]

The court today concludes that just as there are gradations of dishonesty that public policy will tolerate in its police officers, so too there are gradations of sexual misconduct and the exploitation of victims of domestic violence.  That may well be true.  But as the guiding principles in the Restatement and *Pavone* instruct us, it is unrealistic to expect other branches of government to have identified the factual context of every possible instance of misconduct, to have ranked them, and to have drawn precisely the

---

[18]  "The reasonable person standard is a hallmark of the Anglo-American legal system," which "assures that 'the person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly' "; it "also serves to prevent any ad hoc and subjective application by police officers, judges, juries, or others empowered to enforce [the standard]."  *Twp. of Plymouth v. Hancock*, 600 N.W.2d 380, 383 (Mich. App. 1999) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).  *See also Stevens v. Matanuska-Susitna Borough*, 146 P.3d 3, 10-11 (Alaska App. 2006) (quoting *City of Beaufort v. Baker*, 432 S.E.2d 470, 474 (S.C. 1993)) ("The objective 'reasonable' test is used in many areas of the law as an appropriate determinant of liability and thus a guide to conduct.");  *City of Madison v. Baumann*, 470 N.W.2d 296, 302 (Wis. 1991) ("The reasonable-person standard is one that has been relied upon in all branches of the law for generations.").

[19]  *PSEA 2011*, 257 P.3d at 159 n.38 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 178(2) cmt. b (1981)).

[20]  *Id.* at 162.

line at which the misconduct becomes intolerable as a public policy matter. Every instance of potential misconduct need not be predicted in luminous detail before we can find "an explicit, well-defined, and dominant public policy" against it. The Department of Public Safety has done what it reasonably could be expected to do by emphasizing, time and again, how important it is that police officers act with dignity and respect both on and off the job.[21] There seems little room for debate that the conduct at issue here is such as "would cause a reasonable person to have substantial doubt about [the officer's] honesty, fairness, and respect for the rights of others and for the laws of this state and the United States"; and it cannot reasonably be disputed that the conduct "is detrimental to the integrity of the police department where the police officer worked."[22] The court today is unwilling to say so.

I believe it should. To summarize: It violates Alaska public policy when police officers engage in sexual misconduct and the exploitation of domestic violence victims; the Trooper-Grievant's misconduct in this case, in violation of that policy, was serious and reprehensible; and 13 AAC 85.110(b) directs, in language that is sufficiently clear, that an officer who engages in serious misconduct in violation of compelling

---

[21]    *See, e.g.*, AS 18.65.130 (establishing minimum standards for employment as a police officer); AS 18.65.240(c) (providing that the Alaska Police Standards Council may revoke the certificate of a police officer who fails to meet moral character standards); 13 AAC 85.100(a), (b) (listing justifications for denying police certificates); 13 AAC 85.110(a)(2), (3) (delineating implementation of revocation authority, including discretionary revocation for actions detrimental to the reputation or integrity of the police department); Department of Public Safety Operating Procedures Manual (prohibiting behavior that "shocks the conscience or that violates generally recognized standards of professional behavior" and that "brings the Department into disrepute").

[22]    13 AAC 85.110(b).

public policy not be retained.  Necessarily, an arbitration decision *requiring* that the officer be retained under those circumstances is itself in violation of public policy.

I would therefore vacate the arbitrator's award.